# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| UNITED STATES OF AMERICA ) | Case No. 18-cr-10322-WGY |
| ) | |
| v. ) | |
| ) | |
| ROBERT D. CHAIN, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## DEFENDANT ROBERT D. CHAIN'S
## SENTENCING MEMORANDUM

The Defendant, Robert D. Chain, acknowledges that he committed a serious offense and made threats using vile and offensive language. He is deeply ashamed of his words and extremely sorry for the harm they caused. He has already apologized in writing to the *Boston Globe* and the individuals who answered his phone calls, and he looks forward to the opportunity to do so again in court. He also understands and accepts that his crime warrants an appropriate punishment. The purpose of this memorandum is to show that a sentence of time served (consisting of the time Mr. Chain spent in jail on the day of his arrest), followed by two years of supervised release that includes six months' home detention, would adequately reflect the nature and seriousness of the offense and the history and characteristics of the defendant, and would achieve all of the goals of sentencing.

Although this offense was unquestionably serious, it is utterly out of keeping with Mr. Chain's normal behavior, which has been marked by kindness and respect for others. He committed the offense at one of the lowest points in his life, after years spent spiraling downwards

following the suicide of his youngest son. Since his arrest, he has taken numerous steps to climb out of that hole and stay out of it forever. Those include taking anti-depressants, engaging in extensive therapy, quitting a daily marijuana habit, maintaining steady employment, and trying to make amends for his crime. He is a better man than he was even before his son's death; this experience has forced him to undergo personal growth. Under the circumstances, a sentence of incarceration for this 69 year-old first-offender is not necessary to achieve the goals of punishment.

I.    **The 18 U.S.C. 3553(a) Factors Make a Non-Incarceration Sentence Appropriate.**

   **A.  Nature and Seriousness of the Offense.**

The nature and seriousness of Mr. Chain's crime is accurately reflected in the PSR's statement of relevant facts. Mr. Chain called the *Globe* several times, threatened the staff during seven of those calls, and also made vile comments to the young people who answered the phone. That, obviously, is quite serious. At the same time, Mr. Chain never intended to carry out any of his threats, and there is no evidence to the contrary. He made the phone calls in California, where he lives, and never made any plans to travel to Boston. He did not even know the *Globe*'s address. His threats were entirely verbal: he did not, for example, mail envelopes containing white powder, or post photos of people on the internet with crosshairs on them, or take other measures that can enhance the seriousness of a threat. And although he owned a large number of firearms, he did not purchase any in connection with this offense; many of them were antiques that he had acquired over the years. He was a collector of firearms, not a stockpiler.

Significantly, too, it is apparent from the nature of Mr. Chain's threats that he was raving at the time he made them. These were not cold-blooded threats designed to strike fear in the heart of the listener; they were an outpouring of anger. That does not mean they were not serious; they were. But some threats are more threatening (and thus more serious) than others. Mr. Chain's threats gave no indication that he knew the identity of any of the people he was talking to (he did

not), or that he had a grudge against any of them (he did not), or that he had any kind of plan for carrying out his threats (he did not). His threats made him sound like a raving, angry older man.

In short, the nature and circumstances of the offense indicate that Mr. Chain was depressed and angry and made the inexcusable decision to take it out on other people by threatening them. He deserves to be punished for doing so, but the punishment should reflect that the seriousness of the threats was considerably less than in many other threats cases.

### B.  History and Characteristics of the Defendant.

An important consideration in sentencing Mr. Chain is the reason he committed this offense. In August 2018, Mr. Chain was in the depths of a long-simmering bout of depression and anxiety, one that had been building for years, ever since he and his wife found their youngest son dead in his apartment, a victim of suicide. Mr. Chain spent most days home alone, watching 24-hours news channels and yelling at the television, smoking marijuana to dull the feelings of anger and guilt that had plagued him since his son's death. On one such day, a report popped up concerning an editorial campaign promoted by the *Globe* in response to certain statements made by President Trump. Mr. Chain saw that report and made a horrible choice. Instead of swearing a blue streak to himself in his living room, he decided to pick-up his home phone, call the *Globe*, and vent his bile at whomever answered. And he said some truly awful things.

Over the course of a week, Mr. Chain made a series of obscene calls to the *Globe*'s newsroom, located about 3,000 miles from his home in Encino, California. In addition to being offensive, some of these calls were also threatening. And although his threats were empty, inasmuch as he had no intention of harming anyone, a number of the young people who answered those calls were understandably scared. The *Globe* altered law enforcement, who quickly located Mr. Chain, arrested him at his home in California, and charged him here in Boston.

Mr. Chain accepted responsibility for his crime the moment he was arrested. He waived his *Miranda* rights and admitted making the calls. He also promptly pleaded guilty to every count of the indictment. He received no consideration from the government other than a low-end sentencing recommendation.

Mr. Chain is deeply ashamed of his conduct and extremely sorry for the harm he caused. Since his arrest, he's worked hard to remedy that harm and put his life back on track, so that all can be confident he will never again do anything similar. He has apologized to the *Globe* employees who received his obscene calls – writing and sending a heartfelt letter to those victims, expressing his sincere remorse. He has embraced therapy to address the long-standing depression, anger, and anxiety that precipitated his obscene calls. And he has stopped smoking marijuana, a foolhardy attempt at self-medication that only worsened his depression and isolation. Thanks to antidepressants, a great deal of therapy, clean living, and the support of his loving wife of over 40 years, Mr. Chain has never been better. He has rejoined the workforce as an Uber driver – a job that has enabled him to contribute financially to his family and reconnect with society.

In short, since his arrest, Mr. Chain has worked hard to prove to the Court—and, frankly, to himself—that he deserves a second chance, that he is no longer the foul-mouthed, angry man who made those calls, and that a term of imprisonment is unnecessary here. Imprisoning Mr. Chain is not necessary to deter him from committing future crimes given his age, physical limitations, and the steps he has taken in the last year to address the mental health issues that contributed to his crime. Nor is it necessary to promote general deterrence or respect for the law, given that anyone who hears of this story will recognize that Mr. Chain's felony conviction and sentence of home confinement are strong medicine for an older man who has never before committed a crime and whose threats, while scary, were empty. Finally, a probationary sentence

would comport with sentences imposed in similar (or more serious) threats cases, both in this Court and elsewhere, and thus avoid unwarranted sentencing disparities.

Accordingly, we ask the Court to sentence Mr. Chain to time served and followed by three years' supervised release, including six months' home confinement, as that sentence is sufficient, but no greater than necessary, given the circumstances of this case.

## II. Before Any Departures, Mr. Chain's Guidelines Range is 10-12 Months, Based on a Criminal History Category of I and a Total Offense Level of 12.

Prior to application of any departure provisions, Mr. Chain's guidelines range is properly calculated at 10-12 months' incarceration (Zone C) based upon a Criminal History Category of I and a Total Offense Level of 12.

### A. Because Mr. Chain Has No Criminal History, His Criminal History Category is I.

The parties and Probation Officer agree that Mr. Chain has no criminal history, placing him in Criminal History Category I. (PSR ¶¶ 39-45).

### B. Mr. Chain's Correct Total Offense Level is 12, as Stipulated by the Parties.

The parties stipulated in the plea agreement that the Total Offense Level, prior to any departures, is 12. (Plea Agreement, ECF 30, at 1-2). This was based on the following calculation:

- 12: base offense level (USSG § 2A6.1(a)(1)
- +2: more than two threats (USSG § 2A6.1(b)(2)
- - 2: acceptance of responsibility (USSG § 3E1.1)

(*Id.*). The PSR, however, recommends a four-level enhancement under USSG § 2A6.1(b)(4)(B) based on the *Globe*'s spending $16,512.50 on a security firm in response to Mr. Chain's calls. (PSR ¶ 29). The Court should not apply that enhancement for three reasons:

*First*, Mr. Chain's Guidelines range may not be increased based on facts that have not been properly proved or admitted. Whether any funds were expended to respond to the offense is a question of fact. The government did not allege the $16,512.50 expenditure in the Information;

Mr. Chain did not admit the existence of that fact at his Rule 11 hearing, and the Government did not prove it beyond a reasonable doubt to a jury. It would be improper to increase the upper limit of Mr. Chain's guidelines range based on an unproved fact.

*Second*, application of this enhancement would be unfair to Mr. Chain because he was not on notice of it at the time he pleaded guilty, received no discovery relating to it, and thus is in no position to investigate its factual basis and potentially challenge it. The Government did not mention an expenditure of funds in the plea agreement; instead, it stipulated to a guidelines calculation that does not include a 4-level enhancement under USSG § 2A6.1(b)(4)(B). It would be fundamentally unfair to apply an enhancement of which Mr. Chain was not on notice when he agreed to plead guilty.

*Third*, even assuming Mr. Chain had admitted at the Rule 11 hearing that the *Globe* spent $16,512.50 in response to his calls, that is not a "substantial expenditure" within the meaning of the guidelines for a business like the *Globe* that has annual revenues exceeding $100 million.[1] The PSR offers no support for the proposition that $16,512.50 in the context of this case qualifies as "substantial" within the meaning of USSG §2A6.1(b)(4)(B), and we are aware of none.

Removing this improper enhancement has a waterfall effect on various paragraphs in the PSR. Specifically, we ask that the Court order the following changes to the PSR:

- **¶ 29:** delete because there is no enhancement under USSG § 2A6.1(b)(4)(B);

- **¶ 33**: revise to reduce the Adjusted Offense Level to 14;

- **¶ 36**: delete because, due to the reduced Adjusted Offense Level, there is no additional 1-level reduction for acceptance under USSG §3E1.1(b);

---

[1] Greg Ryan & Don Seiffert, *John Henry says the Globe is profitable. Linda Henry's not so sure*, BOSTON BUSINESS JOURNAL, March 9, 2019, available at https://www.bizjournals.com/boston/news/2019/03/08/john-henry-says-the-globe-is-profitable-linda.html (last visited Sept. 24, 2019) ("Last summer, Business Journal sources said that the Globe's 2017 revenue was $270 million, and predicted that it would likely end 2018 at between $225 million and $250 million.").

- **¶ 37**: revise to reduce the Total Offense Level to 12;

- **¶ 82**: revise as follows, "Based upon a total offense level of 12 and a criminal history category of I, the guideline imprisonment range is 10 months to 16 months";

- **¶ 90**: revise as follows, "Since the applicable guideline range is in Zone C of the Sentencing Table, the defendant is ineligible for probation, unless the Court imposes a downward departure."

- **¶ 93**: revise as follows, "The fine range for this offense is from $5,500 to $55,000. USSG § 5E1.2(c)(3)."

- **Page 17, "SENTENCING OPTIONS,"** revise as follows,
  - Total Offense Level: 12
  - Custody: 10 months – 16 months
  - Fine: $5,500 – 55,000

## III. The Court Should Reduce the Applicable Guideline Range Pursuant to Two Downward Departure Provisions.

The Court should depart (or vary) downward based on the aberrational nature of Mr. Chain's criminal conduct and the need to maintain his successful mental health treatment.

### A. The Court Should Depart Downward Pursuant to USSG § 5K2.20.

The aberrational nature of Mr. Chain's conduct warrants a departure under guidelines § 5K2.20 because his calls to the *Globe* were not "significant[ly] plann[ed]," the conduct had a "limited duration," and the conduct represented "a marked deviation" from Mr. Chain's otherwise law-abiding life:

- *First*, there was no "significant planning" behind Mr. Chains' calls to the *Globe* (USSG § 5K2.20(b)(1)), which began as a spontaneous reaction to the paper's announcement that it was "requesting that other newspaper publications around the country publish a coordinated editorial response to political attacks on the media." (PSR ¶ 9). Had Mr. Chain "significant[ly] planned" this crime, he would have taken obvious steps to avoid detection, such as calling from a phone other than his own or his wife's, which were easily traced to him by law enforcement.

- *Second*, the period in which Mr. Chain made these calls was "of limited duration." USSG § 5K2.20(b)(2). The calls resulting in criminal charges were made during a one-

week period, from August 10 to August 16, 2018. (PSR ¶¶ 10-17). And even if one considers Mr. Chain's additional, uncharged calls to the *Globe* as part of this course of conduct, those calls ceased on August 22, 2018. (PSR ¶ 18). Thus, this is a crime of "limited duration" even though it involved more than one act and spanned multiple days. *See, e.g.*, *United States v. Germosen*, 473 F. Supp. 2d 221, 230 (D. Mass. 2007) (finding drug trafficking offense to be "of limited duration" for purposes of USSG § 5K2.20 even though it involved a defendant making two trips, three months apart); *see also United States v. Hued*, 338 F. Supp. 2d 453, 458-49 (S.D.N.Y. 2004) ("The Sentencing Commission . . . made clear when adopting § 5K2.20 that a defendant could qualify for a downward departure under its terms even if the criminal conduct could not easily be considered a 'single act.'") (citation omitted).

- *Third*, Mr. Chain's series of calls was "a marked deviation" from his "otherwise law-abiding life" (USSG § 5K2.20(b)(3)), in which he raised a loving family (PSR ¶¶ 57-61), contributed to society through professional work (PSR ¶¶ 71, 73-75) and community service (PSR ¶ 68), and never before ran afoul of the law (PSR ¶¶ 39-45).

Other circumstances also support application of this departure. *See* USSG § 5K2.20, cmt. n. 3 ("Other Circumstances to Consider") ("In determining whether the court should depart under this policy statement, the court may consider the defendant's (A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense."). For starters, Mr. Chain's criminal conduct was a product of untreated mental issues (*e.g.*, depression and anxiety that grew in the wake of his son's suicide), which he has made great strides to address through long-term therapy over the past year, to which he remains committed. (PSR ¶ 65-67; *see also id.* ¶¶ 59-61). Moreover, Mr. Chain made efforts to mitigate the effects of his offense by writing and sending a heartfelt letter of apology to the *Globe*'s employees, expressing his remorse and shame over his conduct and assuring them that "as odious as [his] words were, [he] never intended to actually harm you or anyone else." (*See* Ex. A (Aug. 14, 2019 Letter of Apology)).[2]

---

[2] After Mr. Chain sent this apology, the *Globe* reported on it, giving it a wider audience. (Ex. B, Danny McDonald, *Calif. man apologizes for threatening to kill Globe employees last year*, THE BOSTON GLOBE, Aug. 15, 2019, available at https://www.bostonglobe.com/metro/

Finally, Mr. Chain is not disqualified from application of this departure under USSG § 5K2.20(c) ("Prohibitions Based on the Presence of Certain Circumstances"). This is so because (i) the offense did *not* involve serious bodily injury or death or the use of a firearm or dangerous weapon,[3] (ii) this is *not* a serious drug trafficking offense, and (iii) Mr. Chain has *no* criminal history outside of this case.

### B. Assuming the Court Applies a Guidelines Range in Zone C, the Court Should Depart Downward Pursuant to USSG § 5C1.1, Which Explicitly Authorizes Imposition of a Non-Custodial Sentence.

Assuming that the Court finds a guidelines range in Zone C of the Sentencing Table (as contemplated by the offense level stipulated in the plea agreement), the desirability of Mr. Chain continuing his extraordinarily successful mental health treatment warrants a departure under USSG § 5C1.1, comment number 7. That provision states:

> There may be cases in which a departure from the sentencing options authorized for Zone C of the Sentencing Table (under which at least half the minimum term must be satisfied by imprisonment) to the sentencing options authorized for Zone B of the Sentencing Table (under which all or most of the minimum term may be satisfied by intermittent confinement, community confinement, or home detention instead of imprisonment) is appropriate to accomplish a specific treatment purpose. Such a departure should be considered only in cases where the court finds that (A) the defendant is an abuser of narcotics, other controlled substances, or alcohol, or suffers from a significant mental illness, and (B) the defendant's criminality is related to the treatment problem to be addressed.

> In determining whether such a departure is appropriate, the court should consider, among other things, (1) the likelihood that completion of the treatment program will successfully address the treatment problem, thereby reducing the risk to the public from further crimes of the defendant, and (2) whether imposition of less

---

2019/08/15/calif-man-apologizes-for-threatening-kill-globe-employees-lastyear/nMg5 HauRgsw6UlTW9YXn2O/story.html (last visited Aug. 31, 2019)).

[3] Although Mr. Chain threatened to shoot *Globe* employees, that does not constitute "use" of a firearm or dangerous weapon under USSG § 5K2.20. *See, e.g.*, *United States v. Langille*, 324 F. Supp. 2d 38, 40-41 (D. Me. 2004) (finding that bank robber's use of a threatening note that read, "This is a bank robbery—have gun in my jacket. Put money in bag or I'll shoot you," did not constitute use of a firearm or other dangerous weapon for purposes of USSG § 5K2.20).

imprisonment than required by Zone C will increase the risk to the public from further crimes of the defendant.

This is a paradigmatic case for application of this departure. Mr. Chain committed his offenses after his son's suicide triggered a downward spiral of depression and social withdrawal, compounded by daily marijuana use over a period of years. (PSR ¶¶ 60-61, 65-66, 69). After the wake-up call of being arrested and charged in this case, Mr. Chain ceased marijuana use and voluntarily participated in a 52-week Intensive Anger Management group and 22 intensive individual counseling sessions with Dr. Jose David Cohen, during which – according to Dr. Cohen – Mr. Chain has been "an exemplary participant." (PSR ¶ 65; *see also* Ex. C, Dec. 20, 2018 Letter from Dr. Cohen; Ex. D, May 9, 2019 Letter from Dr. Cohen). Mr. Chain's therapy is on-going, and records indicate that his "entire participation since his intake session has been marked with a genuine desire to improve his life and never to commit the same errors again." (PSR ¶ 65). Records also note that Mr. Chain is cooperative and insightful and has made "significant improvement in every aspect" of his life. (PSR ¶ 65). In short, Mr. Chain's treatment is working and should continue uninterrupted.

Therapy has helped restore Mr. Chain to the productive person he was before his son's suicide triggered a mental breakdown and daily substance abuse, and that fact supports imposition of a sentence that will enable him to *stay* in treatment and cement his progress. In the words of the guidelines, it is likely that his continued participation in "the treatment program will successfully address the treatment problem, thereby reducing the risk to the public from further crimes of the defendant." USSG § 5C1.1, cmt. n. 7. Mr. Chain's advanced age and poor physical health, and the emptiness of his threats (i.e., he never intended to carry any of them out), further ensure that "imposition of less imprisonment than required by Zone C will [not] increase the risk to the public from further crimes of the defendant." *Id.* Indeed, a Zone C sentence in this case is

far beyond that which is "sufficient, but not greater than necessary" to achieve the goals of sentencing.  18 U.S.C. § 3553(a).

**IV.  Regardless of the Guidelines Range, the Court Should Impose a Variant Sentence of Time Served and Supervised Release That Includes Home Confinement Given Consideration of All the § 3553(a) Factors.**

Whether the Court agrees with Mr. Chain's assessment of the guidelines or Probation's— and even if the Court opts not to depart downward—a holistic assessment of the factors outlined in 18 U.S.C. § 3553(a) demonstrates that a variant sentence of time served with supervised release that includes home confinement is appropriate.  Such a sentence is adequate to achieve specific and general deterrence, promote respect for the law, protect the public, and avoid unwarranted disparities in the sentencing of similarly situated defendants.

**A.  Mr. Chain Is Nearly 70 Years' Old, Ill, and Unlikely to Reoffend.**

Mr. Chain is almost 70 years old and suffers from several chronic illnesses, including heart disease, hypertension, high cholesterol, carpel tunnel syndrome, and Type II diabetes.  (PSR ¶ 63). A letter from Mr. Chain's attending physician attests to the seriousness of  his health issues and opines that "incarceration most likely will affect Mr. Chain's medical condition[,] which can promote further medical illness if not his demise."  (Ex. E, Sept. 22, 2019 Letter from Dr. Cecelia T. Madrid).  Courts frequently have held that advanced age and serious health problems warrant downward variances to sentences of probation, and this Court should reach the same conclusion here.  *See, e.g.*, *United States v. McFarlin*, 535 F.3d 808 (8th Cir. 2008) (holding that downward variance from 60 months to probation was reasonable given defendant's age and poor health, as well as post-arrest rehabilitation); *United States v. Wadena*, 470 F.3d 735, 740 (8th Cir. 2006) (holding that downward variance from 18-24 months to probation was warranted in light of defendant's age, deteriorating health, reduced risk of reoffending, and other factors).

Indeed, courts recognize that advanced age alone is a common and compelling reason for a downward variance. *See, e.g.*, *United States v. White*, 506 F.3d 635, 640 (8th Cir. 2007) ("With regard to his variance . . . things like the Defendant's age . . . are factors that can and should be considered."); *United States v. Whigham*, 754 F. Supp. 2d 239, 252 (D. Mass. 2010) ("Variances also occur because mitigating factors like mental health [and] age … can now be—and should be—considered."); *see also* USSG § 5H1.1 ("Age may be a reason to depart downward in in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration."). Variances based on advanced age make sense in part because studies show that defendants over age 50, like Mr. Chain, exhibit markedly lower rates of recidivism compared to younger defendants. *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12, 28 (2004) (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/researchpublications/2004/200405_Recidivism_Criminal_History.pdf) (last visited Sept. 23, 2019) ("Recidivism rates decline relatively consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates. . . . Among all offenders under age 21, the recidivism rate is 35.5 percent, while offenders over age 50 have a recidivism rate of 9.5 percent.").

Mr. Chain lived his entire life before this episode – almost seven decades – with a spotless criminal record. He has zero criminal history points not because old convictions have simply timed out but because he has never before been in trouble with the law. (*See* PSR ¶¶ 39-45). His spotless record underscores his lack of a propensity for criminal conduct and the unlikelihood that he will reoffend. Thus, there is no reason to conclude that a sentence more severe than time served/home confinement is necessary to promote deterrence or protect the public.

### B. Mr. Chain's Conduct Was Aberrational and Will Not Be Repeated.

Mr. Chain's criminal conduct here was also aberrational, and reflects not the core of the man Mr. Chain is, but the depths to which he had sunk – and from which he is now climbing up, thanks to therapy. The angry, foul-mouthed persona on display in the charged phone calls would be unrecognizable to Mr. Chain's friends and neighbors, who generally regard him as courteous, thoughtful, and caring. A number of them have written letters on his behalf. (*See* Ex. F, Letters in Support). Those letters speak for themselves, but it is worth noting that their themes are consistent: Mr. Chain is a good person, a good father, and a thoughtful community member.

As the PSR documents, Mr. Chain has led a full and productive life. He graduated from U.C. Berkeley with a B.A. in history, moved to Tokyo to study Japanese, and spent several years there teaching ESL before returning to California, taking some graduate courses, and then embarking on a sales career that included time in the steel, advertising, and sports fields. (PSR ¶ 55, 71, 75). Along the way he met his wife, Betty, and they have been married for over 40 years. (PSR ¶ 57).

Mr. Chain's most rewarding roles have been as a husband, father, and grandfather. (PSR ¶ 57). In the early 1990's, once Betty's law practice was established, Mr. Chain sold his interest in a sports memorabilia company he had opened and became the primary parent to their two sons, Andy and Doug. (PSR ¶ 60-61). Andy is now a computer engineer for Northrup Grumman in San Diego, where he has a high-level security clearance and has worked closely with the U.S. military. (PSR ¶ 58). Andy and his wife have a two-year old named Daniel whom Mr. Chain adores. (Ex. A, Letter of Apology, at 1, ¶ 6).

Doug's life turned out differently. He was an exceptionally bright young man, who earned exceptional grades and scores and secured admission to U.C. Berkeley, Mr. Chain and Betty's

*alma mater.* (PSR ¶ 59). But while there, Doug was diagnosed with bipolar disorder. (PSR ¶ 59). His parents helped him obtain treatment, and he managed to graduate from Berkeley's highly-respected engineering school with honors and secure a great job. (PSR ¶ 59; Ex. E, Sept. 22, 2019 Letter from Dr. Cecelia T. Madrid). But his recovery was not consistent, and on a night in October 2012, Doug's mental health issues overcame him. (PSR ¶ 59). That evening, Mr. Chain and Betty went to Doug's apartment to take him to a concert. But Doug did not answer the door when Mr. Chain knocked, or his phone when Mr. Chain called. Beginning to panic, Mr. Chain tried to force open Doug's apartment door and found it barricaded from the inside. Now frantic, he and Betty called 911 and continued to try to force their way inside, screaming Doug's name over and over. But it was too late. Police and paramedics arrived and found Doug dead inside his apartment from an intentional overdose of prescribed medications.

After Doug's suicide, Mr. Chain struggled with overwhelming guilt, grief, and anger. He did not seek help because he had no faith in mental health professionals, believing they had failed his son. (PSR ¶ 66; Ex. A, Letter of Apology, at 1, ¶ 5). He brooded on Doug's death and berated himself for not doing more to protect and help his son. He was at a particularly emotional low point when he heard that the *Globe* was organizing hundreds of newspapers to condemn President Trump, whom he admired. What followed was his series of offensive and threatening phone calls in which he made the terrible decision to vent his anger and pain at others.

But this criminal episode was, truly, aberrational. It was not preceded by *any* pattern of criminal activity. And in the year since his arrest, Mr. Chain has complied with the terms of his supervised release and improved his life in significant ways, demonstrating that the risk of his reoffending is *nil*.

Most notably, Mr. Chain's arrest forced him to confront and address his emotional issues. Since September 2018, Mr. Chain has been in regular treatment to address his depression and anger-management issues. His lead treatment provider, Dr. Jose David Cohen, has written letters that document Mr. Chain's commitment to treatment and the progress he has made. (*See* Ex. C, Dec. 20, 2018 Letter from Dr. Cohen; Ex. D, May 9, 2019 Letter from Dr. Cohen). Mr. Chain is also taking prescribed medication to help stabilize his mood. (PSR ¶ 65). What is more, Mr. Chain has stopped smoking marijuana, which he had seriously abused for years prior to his arrest. (PSR ¶¶ 69-70; *see also id.* ¶ 61). The combination of therapy and clean living has markedly improved his ability to cope with his issues and function productively and consistently. Mr. Chain's newfound employment as a driver for Uber has also given him a sense of pride and purpose that he has long lacked. (PSR ¶ 73; Ex. A, Letter of Apology, at 1, ¶ 6).

Indeed, Mr. Chain's supervising pre-trial release officer from the Central District of California has recognized these positive changes, informing our Court's Probation Office that Mr. Chain "has complied with all Court-ordered conditions of release, has made significant improvements in his life, and has demonstrated a lot of remorse for his offense." (PSR ¶ 4). Mr. Chain's admirable performance on release and his dramatically improved mental health confirm that his odious calls were aberrant behavior, and that a downward variance is appropriate. *See, e.g.*, *United States v. DeRusse*, 859 F.3d 1232, 1235-37 (10th Cir. 2017) (affirming, in kidnapping case with a Guidelines range of 108-135 months, a downward variance to 70 days' time-served and supervised release, based primarily on a finding that kidnapping was aberrant behavior, committed while defendant suffered from mental illness that was subsequently addressed through treatment); *United States v. Munoz-Nava*, 524 F.3d 1137, 1143, 1148-49 (10th Cir. 2008) (holding

that success on pretrial release is an appropriate ground for a downward variance); *United States v. Baker*, 502 F.3d 465, 467, 469-70 (6th Cir. 2007) (similar).

### C. An Appropriate Non-Incarceration Sentence Would Be A Just Punishment.

For a 69 year-old like Mr. Chain who has never been in trouble with the law, the stigma of a felony conviction and its collateral consequences (*e.g.*, losing his rights to vote and bear arms) are significant and support imposition of a non-incarceration sentence, as no further sanction is necessary to show respect for the law or promote deterrence. *See United States v. Prosperi*, 686 F.3d 32, 47-48 (1st Cir. 2012) (affirming downward variances from guidelines ranges of 87-108 months to probation because defendants, among other things, had no prior convictions, and favorably citing district court's observation that "it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed").

The guidelines themselves recognize that first-time offenders like Mr. Chain are particularly appropriate candidates for non-incarceration sentences. *See* USSG § 5C1.1 cmt. n. 4 ("If the defendant is a nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment….").[4] Indeed, when fashioning an appropriate sentence for first-time offenders like Mr. Chain, Courts often conclude that probation is appropriate, even when considering crimes that are more serious than this one. *See, e.g.*, *Prosperi*, 686 F.3d at 47-48; *United States v. Autery*, 555

---

[4]  Mr. Chain does not technically qualify for this particular provision, given that his pre-variance/departure Guidelines range is in Zone C, not Zone A or B.

F.3d 864, 874 (9th Cir. 2009) (upholding trial court's *sua sponte* downward variance from guidelines range of 41-51 months to probation for defendant in child pornography case who had no criminal history); *United States v. Tomko*, 562 F.3d 558, 561 & n.2, 563 (3d Cir. 2009) (upholding downward variance from guidelines range of 12-18 months to probation for defendant in tax fraud case who had minimal criminal history (*i.e.*, one prior conviction for driving a boat while intoxicated)). This Court should find that a probationary sentence is appropriate here, too.

Threats cases in particular cover an extremely wide range of conduct and circumstances. That means a substantial variance from the Guidelines range may be needed to match the sentence to the offense conduct. The guidelines expressly recognize this. Application note 4(a) to guidelines § 2A6.1 states: "The Commission recognizes that offenses covered by this guideline may include a particularly wide range of conduct and that it is not possible to include all of the potentially relevant circumstances in the offense level. Factors not incorporated in the guideline may be considered by the court in determining whether a departure from the guidelines is warranted." If a departure is warranted, so is a variance. *See United States v. Santini-Santiago*, 846 F.3d 487, 490 (1st Cir. 2017) ("[W]e are at a loss to identify any movement away from the applicable guidelines sentencing range that can be justified as a departure but not as a variance…. [A] departure is just a variance by another name.").

The nature of the offense conduct in this case supports a variance to a probationary sentence:

- Mr. Chain had no intention of carrying out his threats. He lived 3,000 miles from the *Globe* and had no plans to travel to Boston to hurt anyone. Indeed, on the day he was arrested, Mr. Chain waived his *Miranda* rights and spoke to the FBI – and the agent leading that questioning recognized Mr. Chain's threats were empty, finishing the interview by saying, "You owned up to it. You did it. You didn't mean it. You weren't going to drive out there and hurt anybody." (Ex. G, Aug. 30, 2018 FBI Transcript of Chain Interview).

- Mr. Chain did not know the identity of the persons who answered the phone, and they did not know him. He simply called the *Globe*'s main number and spoke to whoever answered. This is not a case where a victim was repeatedly threatened by someone he or she knew, which can be particularly terrifying.

- The threats were not personal. Mr. Chain repeatedly stated that "we" are going to kill "you all," making it clear that the threats were not directed at particular individuals but at the *Globe*'s entire workforce.

- The threats were intended primarily to vex, harass, and annoy rather than terrify. Mr. Chain made that plain in his last call to the newsroom: When asked "why you're calling today," he responded in relevant part: "Because you're the enemy of the people and I want you to go fuck yourself. As long as you keep attacking the President, the duly-elected President of the United States, in the continuation of your treasonous and seditious acts, I will continue to vex, harass, and annoy the *Boston Globe*, owned by *The New York Times*, the other fake news." (PSR ¶ 18).

**D. Sentencing Mr. Chain to Time Served Followed by Supervised Release That Includes Home Confinement Would Help Avoid Unwarranted Sentencing Disparities.**

The offense conduct in this case, while admittedly deplorable, is less serious than that of several recent threats cases prosecuted in this District and elsewhere that resulted in downward variances to sentences of probation. Imposition of a non-incarceration sentence in this case would therefore help avoid unwarranted sentencing disparities.

*United States v. Gerald W. Ledford*, 15-cr-10143-NMG (D. Mass.), is a particularly analogous case. The defendant, Ledford, made online threats to the Islamic Society of Boston Cultural Center ("ISBCC") and was prosecuted under 18 U.S.C. § 875(c), the same statute at issue here. (*See* Ex. H (*Ledford* Plea Agreement), Ex. I (*Ledford* Press Release)). As in this case, the threats were made anonymously from a distant state (Iowa) and targeted not particular persons, but rather a group of people based upon an association with an institution (the ISBCC). (*See id.*). Ultimately, although Ledford's Guidelines range was 12-18 months (Total Offense Level

13/Criminal History Category I), the court sentenced him to four years' probation, including six months' home confinement. (*See id.*).[5]

*Ledford* is not an outlier. In *United States v. Lloyd*, 17-cr-00720-SVW (C.D. Cal.), for example, the Court imposed a sentence of probation that included six months' home confinement following a defendant's conviction under 18 U.S.C. § 115(a)(1)(B) for making a threatening and racist call to Congresswoman Maxine Waters. (*See* Ex. J, City News Service, *San Pedro man sentenced to probation for threatening the life of Congresswoman Maxine Waters*, DAILYBREEZE.COM (July 17, 2018), available at https://www.dailybreeze.com/2018/07/17/san-pedro-man-sentenced-to-probation-for-threatening-the-life-of-congresswoman-maxine-waters/ (last visited Sept. 27, 2019)). It did so even though the U.S. Probation Office had determined the Guidelines range to be 10-16 months, and Congresswoman Waters had asked for a non-probationary sentence to avoid "embolden[ing] others to engage in similar conduct." (*Id.*; *see also* Ex. K (Gov't. Sentencing Mem. in *Lloyd*)).

Even more recently, Judge Nathaniel Gorton sentenced a defendant to probation (including one year home confinement) in a more serious threats case than this one, *United States v. Frisiello*, 18-cr-10314 (D. Mass. 2018). (*See* Ex. L, *Massachusetts Man Sentenced for Sending White Powder and Threatening Letters from 2015 through 2018*, JUSTICE.GOV (Apr. 19, 2019), available at https://www.justice.gov/usao-ma/pr/massachusetts-man-sentenced-sending-white-powder-and-threatening-letters-2015-through (last visited Sept. 23, 2019)). In short, although Frisiello admittedly had certain unique mitigating circumstances (*e.g.*, autism), there is no doubt that his

---

[5] In *Ledford*, the U.S. Attorney's Office for the District of Massachusetts and Ledford assented to a Rule 20 transfer back to the Southern District of Iowa for a guilty plea and sentencing. *See* Consent to Transfer of Case for Plea and Sentencing Under Rule 20, ECF 15 in *United States v. Ledford*, 15-cr-10143-NMG.

crime was much more serious than Mr. Chain's: it involved a three-year letter-writing campaign involving more than 15 threatening letters sent to a host of individuals, *many of which contained white powder*, and included the defendant taking steps to avoid detection (such as sending the letters from different mail boxes). (*See id.*; *see also* Ex. M, Philip Marcelo, *Probation for man who sent power to Trump sons, others*, APNEWS.COM (Apr. 19, 2019), available at https://www.apnews.com/57b8835d3ec9433dbadcce6a85e3222c (last visited Sept. 24, 2019)).[6]

Given that defendants in equally or more-serious threats cases have appropriately been sanctioned with sentences of probation, this Court's imposition of the requested sentence in this case would avoid unwarranted sentencing disparities.

## CONCLUSION

For the foregoing reasons, we respectfully recommend that the Court sentence Mr. Chain to time served followed by three years' supervised release that includes six months' home confinement.

DATED:     September 27, 2019     Respectfully submitted,


     MR. ROBERT D. CHAIN

     By his attorneys,

     /s/ William D. Weinreb
     William D. Weinreb (BBO# 557826)
     Michael T. Packard (BBO# 676934)
     Quinn Emmanuel Urquhart & Sullivan, LLP
     111 Huntington Avenue, Suite 520
     Boston, MA 02199
     (617) 712-7100
     billweinreb@quinnemanuel.com
     michaelpackard@quinnemanuel.com

---

[6] Frisiello's victims/letter recipients included members of the Trump family, a senator, state and federal prosecutors, and a law professor.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document filed through the ECF system will be sent electronically to all counsel, who are registered participants as identified on the Notice of Electronic Filing (NEF).

_/s/ Michael T. Packard_
Michael T. Packard

Dated:  September 27, 2019