UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA )
)
v. )        Court No.:  18-cr-10322-WGY
)
ROBERT D. CHAIN, )
)
Defendant. )
_____)

## GOVERNMENT SENTENCING MEMORANDUM

The United States of America hereby submits this memorandum in aid of sentencing for defendant Robert D. Chain ("Chain").  Chain now stands before the Court convicted of seven counts of transmitting violent threats in interstate commerce, in violation of Title 18, United States Code, Section 875(c).  Specifically, Chain called *The Boston Globe* threatening to kill the newspaper's employees in retaliation for an editorial the newspaper ran.

Chain's threatening phone calls were answered by Boston University ("BU") college students who were working in the newsroom as part of a cooperative education ("co-op") program. Chain's phone calls were vulgar, graphic, and frightening.  He called the students names, he made crass remarks about their bodies, and he told them they were "enemies of the people" and that he was going them shoot them in the head.  He told one of the students that "[w]e're gonna shoot every fucking one of you."  He told another student, "I'm gonna shoot you in the fucking head later today at 4 o'clock."  Chain's calls were not simply overheated political rhetoric, but instead were violent threats that were intended to, and in fact did, incite fear and panic in the students who answered them, as well as the newspaper's employees who learned of them.  For more than a week, Chain terrorized *The Globe*, making fourteen menacing calls from his residence in Encino, California, using a blocked phone number.  Chain even taunted his victims, asking one student

"Still there faggot?   Alright why?   You gonna trace my call?   What are you going to do motherfucker?   You ain't gonna do shit."

Chain's criminal conduct was not just limited to *The Globe*.   Chain also called writers at *The New York Times*, leaving vicious and vulgar voicemails for them as well.   For example, Chain left one message for a *New York Times* writer in which he stated, "[d]o you think the pen is mightier than the sword, or that the AR is mightier than the pen?   I don't carry an AR but once we start shooting you fuckers, you're not going to pop off like you do now."   The term "AR" refers to an AR-15 style rifle, which is a powerful semi-automatic assault rifle.   In another voicemail to a female *New York Times* writer, Chain called her a "Jew bitch" and "Jew cunt."

Chain's threatening phone calls to *The Globe* and *The New York Times* were not just criminal, they were abhorrent, vicious, and menacing.   Accordingly, Chain deserves to be sentenced commensurate with his crimes.   Therefore, the United States recommends this Court sentence Chain to a period of incarceration of ten months, as well as to pay restitution to *The Globe* in the amount of $16,512.50, which reflects the additional security costs incurred by the newspaper in response to Chain's violent threats.

## CHAIN'S CRIMINAL CONDUCT

On Friday, August 10, 2018, *The Globe* announced that it was requesting that other newspaper publications around the country publish a coordinated editorial response to political attacks on the media. In its request, *The Globe* editorial board stated, "[p]ublications, whatever their politics, could make a powerful statement by standing together in common defense of their profession and the vital role it plays in government for and by the people." The coordinated editorial response was to be published on Thursday, August 16, 2018.

After the publication of *The Globe*'s announcement, Chain began calling *The Globe*'s newsroom that same day, Friday, August 10, 2018, from his residence in Encino, California.

### Count 1

At approximately 5:30pm eastern time, on August 10, 2018, Chain called *The Globe* newsroom in Boston. The call was answered by Individual A, a BU co-op student working at the newspaper. In the call, Chain told her, "you are the enemy of the people and we are going to shoot you all."

### Count 2

Minutes later, at approximately 5:32pm eastern time, on August 10, 2018, Chain called *The Globe* newsroom from his residence in Encino, California. The call was answered by Individual A again. In the call, Chain stated, "you fucking cunt. We're going to shoot you all."

### Count 3

On Monday, August 13, 2018, at approximately 8:58am eastern time, Chain called *The Globe* newsroom again from his residence in Encino, California. The call was answered by Individual B, another BU co-op student working at the newspaper. In the call, Chain stated to

Individual B: "[y]ou are the enemy of the people.  We will hunt you down and kill you and your dogs."

### *Count 4*

Two hours later, at approximately 10:43am eastern time on Monday, August 13, 2018, Chain called *The Globe* newsroom from his residence in Encino, California.  The call was answered by Individual A, the female BU co-op student he had spoken to on the earlier Friday.  In the call, Chain stated to Individual A: "Hey, how's your pussy smell today, honey, nice and fresh? We are gonna to shoot you motherfuckers in the head, you Boston Globe cocksuckers.  We're gonna shoot every fucking one of you."

### *Count 5*

A few minutes later, at approximately 10:58am eastern time on Monday, August 13, 2018, Chain called the *Globe* newsroom from his residence in Encino, California.  The call was answered by Individual C, another BU co-op student.  In the call, Chain stated to Individual C: "you are the enemies of the people.  We're going to kill you all."

### *Count 6*

Two days later, on Wednesday, August 15, 2018, at approximately 8:37am eastern time, Chain called *The Globe* newsroom from his residence in Encino, California.  The call was answered by Individual B, the BU co-op student who had answered the call on August 13th.  The exchange went as follows:

| | |
|---|---|
| *RC:* | Hey, you're the enemy of the people |
| *Globe:* | Where are you calling from? |
| *RC:* | Do you care? |
| *Globe:* | Yeah, I do. |
| *RC:* | I'm calling from your mother's house.  I fucked her and then I wiped my dick off in her dress.  You should've heard her scream. |

*Globe*:     What's your name?

*RC:*        We're going to kill every fucking one of you.  Go fuck yourself. Call the FBI.  Go get some help from fucking Mueller okay you cocksucker.  You're a dead man.

### *Count 7*

The following day, on Thursday, August 16, 2018, the day that the coordinated editorial ran in newspapers around the country, Chain called the *Globe* newsroom from his residence in Encino, California.  Chain made the call at approximately 9:13am eastern time.  The call was answered by Individual B, the BU co-op student who had answered a call on August 13th.  In the call, Chain stated to Individual B: "you're the enemy of the people and we're going to kill every fucking one of you.  Hey why don't you call the F, why don't you call Mueller?  Maybe he can help you out buddy.  Still there faggot?  Alright why?  You gonna trace my call?  What are you going to do motherfucker?  You ain't gonna do shit.  I'm gonna shoot you in the fucking head later today at 4 o'clock.  Goodbye."

### *Additional Calls to the Globe*

In sum, Chain made a total of 14 calls to *The Boston Globe*'s newsroom from August 10, 2018 and August 22, 2018.  During his final call, on August 22, 2018, Individual A asked Chain why he was continuing to call the newspaper.  In response, Chain stated, "Because you are the enemy of the people, and I want you to go fuck yourself.  As long as you keep attacking the President, the duly elected President of the United States, in the continuation of your treasonous and seditious acts, I will continue to vex, harass, and annoy the Boston Globe, owned by the New York Times, the other fake news.  How's your pussy smell?  Will you answer that since I answered your question.  Is it nice and fresh?  Go fuck yourself and Boston.  It's a shithole."

In response to Chain's threats to kill its employees, the newspaper hired the security firm Ed Davis LLC to provide additional security for *The Globe* headquarters and its employees.  In total, from August 10, 2018, the date of Chain's first call, through August 16, 2018, the day the coordinated editorial was published, the newspaper spent approximately $16,512.50 on additional security expenses as a direct result of Chain's threats.  A breakdown of these additional expenses is included as Exhibit A to this memorandum.

### *Call to the New York Times*

In addition to the calls to *The Globe*, Chain also made calls to reporters at *The New York Times*.  In one voicemail left to an opinion writer for *The New York Times*, Chain stated:  "Do you think the pen is mightier than the sword, or that the AR is mightier than the pen?  I don't carry an AR but once we start shooting you fuckers, you're not going to pop off like you do now.  You're worthless.  The press is the enemy of the United States people.  You know what, rather than me shoot you, I hope a Mexican, or even better yet, I hope a nigger shoots you in the head dead.  Nigger, nigger, nigger, nigger, nigger, nigger, nigger, nigger, nigger, nigger.  Is that that horrible a word?  And by the way, there is no God, because if there is God, he wouldn't have created niggers.  Have a nice day nigger-lover."

In another voicemail to a female *New York Times* reporter, Chain stated, "Do you know how to make a woman scream twice?  First, you fuck her in the ass then you wipe your dick off on her dress.  You're so worthless.  We're going to start shooting you motherfuckers.  Have a nice day cunt."

<u>*Search of the Defendant's Residence and Statement to the FBI*</u>

On August 30, 2018, FBI agents executed a search warrant at Chain's residence in Encino, California.  Recovered during the search were 19 firearms as well as hundreds of rounds of ammunition.  The firearms included a shotgun, rifles, and semi-automatic handguns.

Following execution of the warrant, Chain was read his *Miranda* rights and agreed to speak to FBI agents.  During the interview, he admitted to calling the *Boston Globe* because he thought the editorial was "ridiculous," but stated that he "had no intent on harming anybody physically." Chain was asked about his firearms, and stated that he kept the firearms because they were relaxing and kept him from being violent.  He also stated that he buys "a thousand rounds [of ammunition] because its cheaper."  When asked specifically how many guns he had, he responded, "you know the saying, if you know how many guns you have, you don't have enough."  He ended the interview by stating, "[a]s far as I know I didn't threaten to shoot anybody in the head…I guess I did.  I don't know that I did.  You guys say that you have me on tape.  I am not admitting that I did.  But if I did, I did.  Well, if it's on tape, it's probably me."

## SENTENCING RECOMMENDATION

### A. The Sentencing Guidelines

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the United States Sentencing Guidelines were no longer mandatory. However, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining the defendant's sentence. Gall v. United States, 552 U.S. 38, 49 (2007). While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," Kimbrough v. United States, 552 U.S. 85, 90 (2007), it remains the case that "the Commission fills an important institutional role: it has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise,'" id. at 109 (quoting United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). The Supreme Court noted that "in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" Kimbrough, 552 U.S. at 109 (quoting Rita v. United States, 551 U.S. 338, 350 (2007)). Accordingly, the First Circuit has explained:

> First, the court should calculate the [Guidelines Sentencing Range], including any appropriate departures. After calculating the GSR, the court should consider the factors set forth in 18 U.S.C. § 3553(a) to determine whether a sentence outside the guidelines range is appropriate. Finally, the court must determine what sentence is appropriate and explain its reasoning. The court should select a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing.

United States v. Smith, 531 F.3d 109, 111 (1st Cir. 2008).

In this case, the government and the defendant agreed to a calculated sentencing guidelines range in the plea agreement.  This agreed-upon calculation varies slightly from the one calculated in the Pre-Sentence Investigation Report ("PSR") as discussed further below.

### The Agreed-Upon Sentencing Guidelines Calculation

Under the United States Sentencing Guidelines ("U.S.S.G."), the parties agree that the applicable sentencing guidelines provision is § 2A6.1(a)(1), which states that the base offense level is 12.  The parties further agree that the defendant's offense level is increased by 2 levels because Chain made more than 2 threats.  <u>See</u> U.S.S.G. § 2A6.1(b)(2).  Pursuant to § 3E1.1, the defendant's offense level is decreased by 2 levels for acceptance of responsibility.  Accordingly, the resulting offense level agreed to by the parties is level 12.

**Calculation of Offense Level:**

|  | Offense Level |
|---|:---:|
| Threatening communications offense level (§2A6.1(a)(1)) | 12 |
| -   Involved more than two threats (§2A6.1(b)(2)) | +2 |
| -   Acceptance of responsibility (§3E1.1) | -2 |
| **Total Offense Level** | **12** |

Based on an offense level of 12, and a criminal history category of I, Chain's sentencing guidelines range is 10-16 months imprisonment.

### Substantial Expenditures of Funds to Respond to the Offense

As explained above, in response to Chain's threats, *The Globe* spent $16,512.50 on additional security expenses.  As a result of these expenditures, the PSR included a 4-level enhancement pursuant to § 2A6.1(b)(4)(B).  The defense objects to inclusion of this enhancement and argues that $16,512.50 is not a "substantial expenditure of funds" in relation to *The Globe*'s total revenue.  Consistent with the plea agreement, the government does not take a position on

whether the provision should apply to the defendant's sentencing calculation.  The government does object, however, to an interpretation of this guideline provision that expenditures spent in response to the threats should be measured relative to the victim's resources.  Indeed, the defense cites not support for this proposition.  See Def.'s Sent. Mem. at 6.

The Eleventh Circuit has held with respect to this provision that it should be given "the plain meaning of those words."  United States v. Snipes, 466 Fed. Appx. 800, 801 (11th Cir. 2012).  While it was defining a parallel subsection of the provision involving the "substantial disruption" of public services, the circuit court held that "using dictionary definitions, we interpret 'substantial' to mean 'of ample or considerable amount, quantity, size, etc.'"  Id.  Nowhere in this definition of "substantial" did the court adopt the concept of comparative or relative significance of the expenditure to the resources of the target of the threats or law enforcement who responded.  The government submits that the Eleventh Circuit's reading is correct, and this Court should not adopt the defense's position that the guideline only applies if the amount expended in response to the threats is relatively significant to the victim of those same threats.

## C.  The § 3553(a) Factors

Following calculation of the sentencing guidelines, the Court must next turn to the factors set forth in 18 U.S.C. § 3553(a) to determine whether a sentence outside the guidelines range is appropriate.  See Smith, 531 F.3d at 111; United States v. Dixon, 449 F.3d 194, 205 (1st Cir. 2006) (noting that a sentencing court need not consider each factor the same, or "address those factors, one by one, in some sort of rote incantation").  The government submits that a sentence of incarceration for Chain for 10 months is consistent with the § 3553(a) factors as applied to this case.

1.  <u>The Need for the Sentence to Reflect the Seriousness of the Offenses, Promote
    Respect for the Law, and Provide Just Punishment for the Offenses</u>

The government submits that a ten-month sentence of incarceration for Chain is necessary to "reflect the seriousness of the offense," "promote respect for the law," and "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). The seriousness of Chain's crimes should not be understated. For twelve days, Chain terrorized the employees of *The Globe* newspaper. As described by the victims, employees feared for their lives just because they were doing their jobs. In addition, Chain made similar vulgar and threatening calls to writers of *The New York Times*. While heated political discourse and criticism of the media is constitutionally protected speech, when that criticism extends into violent, menacing threats it violates the law and should be met with a firm and just punishment. This is particularly so when those violent threats are meant to chill the First Amendment's right to a free press. Chain had innumerable legal and appropriate ways in which to register his disagreement with the newspapers, but instead he chose terror. Chain's threats were not an accident or mistake; his conduct was not a single aberrant occurrence. Instead, it was a deliberate and planned campaign of terror and harassment that lasted over a harrowing twelve-day period.

2.  <u>Avoiding Unwarranted Sentencing Disparities</u>

A 10-month sentence of incarceration for Chain is consistent with other sentences imposed in cases involving violent threatening communications similar in nature to what he did. As detailed below, similar sentences of incarceration have been imposed in cases involving multiple threats over a short period of time similar to what the defendant did in this case.

***<u>United States v. Freeman</u>***, *176 F.3d 575 (1st Cir. 1999):* in this case, the defendant made a total of eight interstate telephone calls to a missing children hotline over a two-day period. In the calls, the defendant falsely stated that he had forcefully abducted and sexually abused his

fourteen year-old stepdaughter, and that he was going to leave her to die.  In fact, the defendant did not have a stepdaughter and was playing an elaborate prank.  The defendant pled guilty to a single count of violating Title 18, United States Code, Section 875(c), and was sentenced to **thirty months imprisonment**.  In affirming the sentence, the First Circuit noted that the defendant had found the hotline's telephone number, placed eight calls over two days, and continued to perpetrate the hoax in each call.  "With respect to each phone call, and certainly the multitude of phone calls in aggregate, there were many steps along the way in which he could have stopped himself, but he didn't."  Id. at 580 (internal citation omitted).

_**United States v. Clemens**_, 738 F.3d 1, 3 (1st Cir. 2013):  in this case, the defendant was convicted after trial of sending two emails threatening an opposing counsel in a civil lawsuit he had filed, as well as the town administrator of Scituate, Massachusetts.  In the first e-mail, which was sent to the attorney, the defendant wrote, "I believe you are playing a dangerous game, a very dangerous game.  I have every hunch someone is going to get hurt.  At this point…I'm rather hoping someone will [deserving it, of course]."  Id. at 4 (alteration in original).  Later in the same e-mail, he wrote, "You, at this point, I assure you, will get what you deserve.  Pow!  Bang!  Splat!  I really, truly and sincerely wish you were dead."  Id. at 5.  In the second e-mail, which was sent to the town administrator, the defendant wrote, "You all might be digging yourself a grave."  Id. at 6.  Following a jury trial, the defendant was convicted of two counts of sending threatening communications in interstate commerce.  He was sentenced to **5 years imprisonment**.

_**United States v. Nedd**_, 262 F.3d 85, 87 (1st Cir. 2001):  in this case, the defendant was a thirty-eight year old man suffering from manic depression and schizophrenia.  The defendant became obsessed with a woman that he knew from church and began harassing her and her family.  Over a period of three months, the defendant left four threatening voicemails on the victims'

answering machine.  In the voicemails, the defendant threatened to kill the victim and her family.
Specifically, he stated, "if I don't get my fucking shit back that I gave your daughter…with a
fucking note that says I am sorry that I hurt your feelings…I will fucking kill you, and her, and
your fucking wife [slams the phone down]."  Id. at 88 (alternation in original).  In another
voicemail, the defendant stated, "I'm coming to Boston, Richard, and this time you won't see me.
And when you come to your fucking house, I will break your fucking head open.  I will kill your
wife and your fucking daughter if you do not send all my personal things back…."  Id. (alternation
in original).

The defendant pled guilty to five counts of sending threatening communications in
interstate commerce.  He was sentenced to **thirty-three months imprisonment**.

As these prior cases demonstrate, a sentence of incarceration is appropriate in this case.
Like the cases described above, Chain engaged in a deliberate and systematic effort to threaten
and harass employees at *The Globe*, making fourteen calls over a period of twelve days.  The
language that Chain used in those threats was similar, and arguably much worse, than the threats
in the cases cited above.  Moreover, similar to the defendant in the Nedd case, Chain threatened to
travel to *The Globe*'s newsroom to kill the employees "later today at 4 o'clock."  Finally, Chain's
threats were not limited to just one newspaper, but also included threats made to writers at *The
New York Times* as well.  Given all of these facts, the government respectfully submits that a ten-
month sentence is consistent with other sentences imposed in similar cases.

3.  The Nature and Circumstances of the Offenses – the Impact on the Victims

Lastly, before deciding on Chain's sentence, the Court must also consider the impact the
defendant's criminal conduct has had on the victims in this case.  Attached to his memorandum as

Exhibit B is a victim impact statement from the BU co-op student identified as Individual A in the

Indictment.  In her statement, the victim eloquently wrote:

> To say I was scared is an understatement.  I was terrified; terrified I
> would never see my family again; terrified I wouldn't be able to
> continue my journalism career; terrified that I would never see my
> family again; terrified that I wouldn't be able to continue to my
> journalism career; terrified that everything I had worked so hard for
> up until that point would be thrown away because of a man who
> believed Trump when he said the media is the enemy of the people.
> I am not the enemy of the people, and neither are the thousands of
> other journalists around the world.  I was just a 21-year-old woman
> doing her job.

Exh. B, at 2.  In addition to Individual A's statement, the government also expects that the Court

will also hear from another of the BU co-op students at Chain's sentencing hearing as well.

    What is abundantly clear from these students is the palpable fear and anxiety that they felt

from Chain's threats.  While Chain may argue he never intended to carry out his violent threats,

the students and the newspaper employees had no way of knowing if his threats were going to

become reality.  Moreover, within the atmosphere of the proliferation of mass shootings in this

country, and specifically, the attack on the Capital Gazette newspaper in Annapolis, Maryland

which had occurred just over a month prior, Chain's threats took on an even more menacing feel.

In sentencing this defendant, this Court should consider the absolute terror that the defendant so

carelessly imparted on his victims.

## CONCLUSION

For all these reasons, and for the reasons set forth in the PSR, the United States respectfully

requests that this Court sentence defendant Robert Chain to a period of incarceration of ten months,

and to pay *The Globe* restitution in the amount of $16,512.50.

Respectfully submitted,

ANDREW E. LELLING
UNITED STATES ATTORNEY

By:    /s/ George P. Varghese
GEORGE P. VARGHESE
Assistant United States Attorney
John J. Moakley United States Courthouse
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
(617) 748-3100
george.varghese@usdoj.gov

Dated:  September 30, 2019

## Certificate of Service

I hereby certify that the foregoing document filed through the ECF system will be sent electronically to counsel for the defendants, who are registered participants as identified on the Notice of Electronic Filing (NEF).

By:    /s/ George P. Varghese
GEORGE P. VARGHESE
Assistant United States Attorney

Dated:  September 30, 2019